## PROGRESS LAUNDRY & CLEANING CO. v. RECIPROCAL EXCHANGE et al.

### No. 12248.

Court of Civil Appeals of Texas. Dallas.
July 10, 1937.

Rehearing Denied Sept. 25, 1937.

227

Burgess, Chrestman & Brundidge, O. A. Fountain, and H. A. Bateman, all of Dallas, for appellant.

Thompson, Knight, Baker & Harris, Ben F. Vaughan, Jr., and William H. Neary, all of Dallas, for appellees.

BOND, Justice.

Appellant instituted this suit for damages by fire to a cylindrical return tubular boiler, located in its laundry in the city of Dallas. Appellees are the insurance carrier. There is no controversy about the policy of insurance being issued, or that appellant suffered damages, the sole contention being that the fire which caused the damage is what is known in the law books as a "friendly fire."

At the conclusion of the testimony, the trial being before a jury, the court peremptorily instructed a verdict for the insurance carriers; accordingly, entered judgment against appellant.

In determining the liability of the insurers for the damage sustained, we deem it advisable to note the distinction between fires that are hostile and those that are friendly. We think the overwhelming weight of authorities is that, so long as a fire burns in a place where it was intended to burn and ought to be, it is to be regarded as an agency for the accomplishment of some intended purpose, although damages may have resulted where none were intended, thus such fire is a "friendly fire" and insurers are not liable for damages flowing therefrom; but, where a friendly fire escapes from the place where it ought to be to some place where it ought not to be, resulting in damages, such fire becomes a hostile peril for which the insurers are liable.

In Reliance Ins. Co. v. Naman, 118 Tex. 21, 6 S.W.(2d) 743, 745, the Supreme Court of Texas held that, when a fire which occasioned damages is confined to the usual and ordinary place, such as a fire burning in a furnace, or a stove, or a lamp, where it was intended to burn, it is considered a friendly fire, and damages that may be caused by such a fire are not considered to be within the terms of an ordinary insurance policy. The following language of the Supreme Court in that case is helpful in suggesting illustrations of friendly fires not insured against, viz: "If the fire in the furnace was such a fire as the company insured against, then it would be liable for any direct loss or damage therefrom, and it would follow the insured could recover his damage for loss occasioned by the cracking of the plaster in the furnace basement from the heat of the furnace, for the cracking of the paper on the walls from the heat of the grate, and for damage to the decoration and draperies through smoke and soot from the furnace or chimney place, and even for the replacement of furnace, grate, and range oven when burned out, for those clearly would be losses directly due to the respective fires. Those are not extreme illustrations, but liability in each instance would follow if the fire in this case be held to be within the policy."

In American Towing Co. v. German Fire Ins. Co., 74 Md. 25, 21 A. 553, plaintiff sued for damages to a boiler. The boiler was damaged due to the absence of water. It was there determined that the plaintiff could not recover because the damages resulted from a friendly fire. So, also, is the case of McGraw v. Home Ins. Co. of New York, 93 Kan. 482, 144 P. 821, Ann. Cas.1916D, 227; there, the plaintiff sought judgment upon a fire insurance policy on account of injury done to a steam boiler by fire when the boiler was supplied with an insufficient amount of water. The

court held that no liability attached to the insurance company because of the intended application of the fire to the boiler, and that the loss or damage was occasioned not by a hostile element (the fire), but was due to negligence of the boiler operator in allowing the water to become exhausted. In that case, the fire was a friendly agency, intentionally applied and confined in the usual and customary place, within the contemplation of the policy of insurance. There the damage to the boiler was the direct result of negligence of the operator of the boiler, and in no sense attributable to an uncontrollable or hostile agency. To the same effect is the holding of the Waco Court of Civil Appeals in the case of City of New York Ins. Co. v. Gugenheim, 7 S.W.(2d) 588. In that case, the damage to the insured property was caused by fire entering and burning in a furnace compartment intended for air only. The fire was regarded as friendly so long as it was confined and remained in the fire compartment of the furnace, and until it broke out in the compartment intended for air, then, the court held, that such fire became hostile, one which became uncontrollable, broke out from where it was intended to be, and became a hostile element in a place where it was not intended, thus causing damage to property covered by the policy of insurance.

The facts in the instant case show that the boiler in question was incased with brick, the bottom one-third was directly exposed to the flame of two gas burners, located in the front and under the shell or belly of the boiler. The inside of the boiler contained 86 tubes, which ran the full length of the boiler and at each end they were attached to the boiler shell, and at the front end a stack or chimney was connected. The heat was generated by ignition of gas. In the normal operation of the boiler, approximately 2,000 gallons of water were placed inside the boiler shell, completely submerging the 86 tubes; the gas ignited at the front end, the draft or suction of the stack or chimney pulled the heat and flames along and underneath the boiler shell, back through the tubes, and then out the stack or chimney. By the presence of water inside the shell and around the tubes, the heat from the shell and tubes convert the water into steam for use in the laundry plant, and prevent the burning of the boiler shell and the tubes within the boiler. The boiler and tubes were not designed to withstand the enormous heat intended to be generated by the gas burners, without a sufficient amount of water to incase the tubes, and, of course, fire was not intended to be applied beneath the boiler without sufficient water being therein.

■ On the occasion in question, the gas burners under the boiler ignited, the fire burned where it was intended to burn —underneath the boiler—and the heat and flames took the usual and customary course, along the belly of the boiler, back through the tubes, and out the stack or chimney. It is undisputed that, unintentionally, there was either no water put into the boiler before the gas ignited, or that the water escaped from the boiler by some unknown means, after the gas ignited. In either event, manifestly, by the absence of water in the boiler, the fire caused the lower 20 tubes to melt in two and the fire to break out from the tubes and burn within the shell where water was intended to be. So long as the flames of the fire remained in the tubes, where it was intended to burn and ought to be, under the authorities cited, it must be regarded as being a friendly fire; but, when the fire broke through the tubes, entered and burned in the compartment, or shell, which water only was intended for, it became a hostile element, and all damages to the boiler and its component parts thereafter occasioned by the fire were such as coming under the coverage of the policy.

■ It is uncontroverted that the boiler and its component parts were damaged on the occasion in question, and, we think, the only question here to be considered is: Is there any substantial evidence in the record showing that the boiler and its parts were damaged after the 20 tubes melted in two, allowing the heat and flames to enter and burn in the shell, where it was not intended to enter and burn; and, if so, the amount of such damages? If the damages to the boiler and parts were occasioned both by fire, which escaped from the melted tubes, and by fire confined to the spaces where it ordinarily was supposed to be, it was incumbent upon the plaintiff to prove the extent and amount of such damages occasioned solely by the insurable cause. In other words, when damage to property is occasioned by two separate causes, one covered by a policy of insurance and the other not covered by such policy, the proof must show the

amount of recoverable damage arising solely from the cause covered by the policy insured against. Obviously, in the case at bar, such proof must rest almost entirely on circumstantial evidence and on competent expert testimony, basing a conclusion on postautopsy of the object of insurance.

█ The trial of this cause having resulted in an instructed verdict, it must be conceded that, if appellant was entitled to a jury finding upon the facts raised in pleadings and evidence, the action of the trial court, in so instructing the jury and in rendering judgment, was improper. In determining the issue, we must consider only the evidence favorable to appellant's contention, discarding all evidence to the contrary. If the evidence tends to show that any damage to the boiler in question, or its component parts, was due solely to the fire after it broke out from where it was confined and entered and burned in the compartment where water only was intended, and the amount of such damage, the court erred in instructing the verdict and in rendering judgment in favor of appellees.

Appellant's testimony shows that either no water was put in the boiler or that the water escaped, and, because of the lack of water or insufficient amount of water, the insured property was damaged by the fire; 20 tubes in the boiler were demolished, melted in two, and the remaining 66 tubes were bent, caused to sag downward, thus pulling the end of the shell, to which the tubes were attached, inward; the upper two-thirds of the seams around the boiler were uncaulked and the rivets loosened, and the bricks around the middle seam and on both ends of the boiler were buckled. After the 20 tubes had melted, the heat and flames broke through, entered and burned directly in the shell of the boiler. The testimony further shows that all of the 86 tubes had to be replaced, the shell of the boiler riveted and caulked, and the brick removed and replaced, at a reasonable cost of $1,716.25. The damages were itemized and the testimony established their reasonableness.

Mr. B. P. Pratt, a witness for appellant, testified that, after the fire, he inspected the interior of the boiler, saw the effect of the fire on the tubes, shell, and brick furnace. The lower tubes had burned in two, the upper tubes bent and sagged downward, the shell of the boiler had become unriveted and uncaulked, and the brick furnace demolished; and, after qualifying as an expert witness, further testified that, when the 20 tubes near the bottom of the boiler were burned in two, while the fire was still on, the result was that the fire escaped inside the boiler shell through the broken, burned-out ends of the tubes, causing the fire then to heat the shell to the extent that it loosened all the rivets and seams and bent the remaining tubes; that, in his opinion, the cause of all the damage to the tubes, other than the 20 which were burned in two, was the result of the fire which got into the shell. A Mr. L. F. Shaver, another witness for appellant, in response to questions, testified, in effect, that he also inspected the boiler after the fire, depicted its condition in much the same way as the above testimony of Mr. Pratt, and the reasonable cost for the repairs of such damages, and further testified, after qualifying as an expert witness, that the condition of the boiler as he detailed it was due to the heat and flame of fire breaking out from the 20 tubes entering and burning inside of the boiler shell; that damages to the boiler would not have occurred at all if the fire had been restrained or confined in the tubes; that the tubes would not have dropped down if it had not been for the fire inside the boiler; that the fire in the water compartment of the boiler caused the boiler and tubes to get "red-hot"; and that, if the fire had stayed in the tubes, none of them would have sagged and the damage to the boiler and parts would not have occurred. A Mr. D. P. Wallace, another witness for appellant, in response to questions, testified to the same effect as the above witnesses, and further, after qualifying as an expert witness, said that in his opinion the top 66 tubes would not have become distorted or sagged down and pulled in the ends of the boiler, if the fire had not broken loose inside the boiler; that the seams around the boiler shell would not have become uncaulked if the fire had not been inside the boiler; that the brick, mortar, and fire clay piled down under the boiler, in the firebox, was caused by the fire on the inside of the boiler shell; and that 90 per cent. of the total damages to the boiler was occasioned by the fire after it got inside the boiler.

We think the testimony raised the issue that some of the damages which appellant sustained were due to a hostile fire, the extent and the amount thereof to be determined by the jury. The constant direct

230

application of the flames on the outside and on the inside of the boiler would be calculated, as shown by the evidence, to cause some deterioration.. It is undoubtedly true that it was contemplated by the contracting parties to the insurance that deterioration or damage naturally resulting to the boiler by fire and elements would not be insured against; but, at the same time, we think, it is equally true that the parties must have intended that direct loss or damage to the boiler and tubes, caused by fire directly applied to a place where it was not intended and ought not to be, would not be the result of normal use of the equipment, but would be a catastrophe against which the insurance was intended to protect. Therefore, we are of the opinion that there was sufficient evidence for determination of whether any portion of appellant's insured property was damaged by the fire after it escaped from the place where it was intended to be, and the extent of such damage; and that it was reversible error for the court to instruct the jury to return a verdict for the appellees.

Our conclusion upon the question discussed renders it unnecessary to mention other assignments; however, they have been carefully considered; finding no error, they are overruled. The judgment of the lower court is reversed and the cause remanded.